No. 170.—Heirs of Brown et als v. E. & B. Jacobs et al—J. W. Mc-Donald, Administrator, Intervenor.

An agreement made and reduced to writing between the administrators of an estate and' third parties relative to the sale of a plantation under administration by them which fixes a price per acre, and binds the administrators to make a good title before the money is paid is not, in itself, a fraudulent nor an illegal act which will vitiate the sale when regularly made in pursuance of the forms of law in the sale of succession property.

If the terms of the sale of succession property were partly for cash and partly on credit, the fact that the purchaser chooses to pay the entire price in cash is not an evidence of fraud on the part of the purchaser, especially if the notes which were to be given for the credit portion only drew interest after a specified time from their execution.

Forced heirs have only a residuary interest in the succession of their ancestors, and they can not therefore maintain an action to annul a judicial sale which has been regularly made of their ancestors' property to pay the debts of the succession.

A judicial sale of real estate belonging to a succession which has been made for the purpose of paying the debts of the estate before the adoption of the Constitution of 1868 is not void or voidable, because the price received was in Confederate treasury notes. Article 149 of this Constitution has no application to contracts which had been executed before its adoption. In such a case the courts will leave the parties where their conduct has placed them.

APPEAL from the Tenth Judicial District Court, parish of Caddo. *C. M. Pegues,* attorney at law, Judge *ad hoc*, vice *Levisee,* Judge,. recused. *W. B. Egan,* for plaintiff. *Nutt & Leonard,* for intervenor. *John Ray,* for E. & B. Jacobs, defendants. *George Williamson* and *S. L. Taylor,* for defendants.

Ludeling, C. J. This suit was instituted by the forced heirs of J. H. and Rebecca S. Brown, deceased, and J. T. Bryan, a judgment creditor of said decedents, to annul a judicial sale of the plantation and personal property belonging to said successions, made on the fourteenth day of April, 1863, to E. and B. Jacobs, and to recover the plantation, and the value of the personal property thus sold.

The nullity of the sale is claimed on the following grounds: That the sale was without any legal, valid or valuable consideration—the price paid being Confederate money; that the sale was for much less than the appraised and real value of the land; that the price being in Confederate money it was less than one-thirtieth of the value of the land; that there was no commission to the administrators or any person to authorize them to make a sale; that Morrow and Kennon never qualified as administrators of the succession of R. S. Kennon, which was never regularly opened; that two of the children of J. H. and R. S. Brown died before the sale, and their successions were never opened; that no family meeting was held to fix the terms and conditions of the sale in the interest of the heirs, who were minors; that there was no meeting of creditors, and neither they nor the heirs ever consented to the sale; that the forms of law and the terms of sale were not complied with; that the real estate could not be sold legally until the slaves and personal effects of the succession had been sold; that the slaves and personal property would have sufficed to pay the debts, but they have been lost to plaintiffs through the acts and neglect of the defendants and the administrators; that there was not property enough left to pay the debts, but that with the land there will be enough to pay the debts and leave something for the heirs; that no part of the consideration for the sale inured to the benefit of the heirs or creditors; that although the sale was clothed with some of the forms of law, yet it was made through fraud and collusion between E. and B. Jacobs and the administrators, and that its real purpose was to carry out an illegal and fraudulent agreement entered into by private writing on the fifth day of December, 1862; that the succession of Rebecca S. Brown was not opened when the private agreement was entered into, and that Kennon and Morrow subsequently applied for the administration in order to carry out said agreement, and for that purpose all the subsequent proceedings were had; that no tableau of debts was filed in the succession of Rebecca S. Brown, and no necessity was shown to sell said lands, and that none existed; that said Morrow and Kennon applied for an order in said succession to sell the land before procuring their appointment as administrators, and that the orders of appointment and for the sale bear the same date, and were made with a view to forward the execution of said private agreement, all of which was well known to the defendants prior to the sale.

The defendants are A. Marshall, a tenant in possession; E. J. Kennon, one of the former administrators of the successions of Brown and Edward and Benjamin Jacobs, the purchasers of the property and the real defendants.

Marshall and Kennon filed general denials. E. and B. Jacobs admit their possession of the land in dispute, and aver that they bought it in

good faith at a judicial sale on the fourteenth day of April, 1863, and that they have paid the price in full. They deny the charge of fraud and collusion, and they pray for the value of improvements in case of eviction.

The case has been argued orally and by briefs with great zeal and ability, and after a careful examination of the record and the authorities cited we have reached the following conclusions:

James H. Brown died in Bossier parish in the year 1860, and his wife Rebecca S. Brown died within a few months thereafter, leaving several children, of whom the plaintiffs alone survive. When J. H. Brown died he was in possession of a plantation on Red River, a number of slaves, mules, cattle and hogs, a quantity of corn and cotton and other personal property which belonged to the community of acquets and gains, which had existed between himself and his wife. On the tenth day of April, 1861, Morrow and Kennon were appointed administrators of the estate of J. H. Brown. On the eighth of December, 1861, an order was granted on their application for the sale of the land, but the sale was not made.

In December, 1862, the administrators of E. and B. Jacobs entered into the following agreement:

"This obligation entered in duplicate between James M. Morrow and Edward J. Kennon of the one part and E. and B. Jacobs of the other part. The first party, residents of Claiborne and Bienville parishes, and the second party, residents of Caddo parish, witnesseth that the said Morrow and Kennon, administrators of the succession of James H. Brown, deceased, do hereby bind themselves individually and personally unto the said E. and B. Jacobs to perfect and make good title to them of the plantation belonging to the succession of the said James H. Brown, lying on the west bank of Red River, in Caddo parish, Louisiana, bounded on the north by Daniel's plantation and on the south by Patrick Cash's, and opposite the Waterloo plantation, supposed to contain about five hundred and fifty acres, more or less—the number of acres to be ascertained by a survey to be made by Hailey Watts, or any other legally authorized surveyor, within forty days from this date, the same to be made at the expense of the said succession. The said Morrow and Kennon bind themselves to perfect said title as aforesaid by due legal sale at public auction within the next forty days. The consideration for the above transfer is as follows: The said E. and B. Jacobs bind themselves to pay to the said administrators seventy-five dollars per acre for each and every acre there may be ascertained to be contained in said tract by said legal survey—that is to say, seventeen thousand dollars to be paid down in cash upon the completion and perfection of the title, and upon the giving of possession of said land, and the balance of said purchase money, whatever it may be upon

the ascertainment of the number of acres, at the said rate of seventy-five dollars per acre, payable in two equal installments, the first due six months after the sale and perfection of title, and the second due in twelve months after said date, with mortgage to secure payment.

"And it is understood between said parties that the said E. and B. Jacobs shall have the privilege of making any larger cash payment than is hereinbefore stipulated, and that the said E. and B. Jacobs shall, at any time before the falling due of the installments or credits, be allowed to take up their outstanding notes therefor.

"And the said E. and B. Jacobs do further bind themselves to pay interest at the rate of eight per cent. per annum upon the credit installments four months after the day of their date.

"Thus done and signed at Minden, Claiborne parish, State of Louisiana, in presence of the undersigned witnesses, this fifth day of December, 1862.

"J. M. MORROW,
"E. J. KENNON,
"Witnesses :                          "E. and B. JACOBS."
        "J. P. SMITH,
        "H. A. DREW."

On the eighth of December, 1862, Morrow and Kennon presented their petition to the court for the sale of the plantation, and an order to sell was granted on the same day. No sale appears to have been made under that order. About one month after Morrow and Kennon applied to be appointed administrators of the estate of Mrs. Brown. They took the oath required by law on the second and third of March, the bond was filed on the sixth of March, 1863, and on that day the order of appointment was signed. Morrow and Kennon, as administrators of both successions, then applied for an order to sell the property, which was granted, and after due advertisement the property was adjudicated by one of the administrators to E. and B. Jacobs for seventy-five dollars per acre, and according to the terms of the advertisement and order. Whether there was a commission or execution issued under this order is not made certain by the record before us—none is found in the record; but the *procés verbal* of the sale made by the administrator recites that the administrator of both successions, "in pursuance of the annexed commissions issued in said successions," adjudicated the property to E. and B. Jacobs. A commission, however, had been issued under the first order to sell the property of the succession of James H. Brown. Both orders directed the administrators to sell the property and fixed the same terms. We do not think a commission or execution in such a case indispensable. 18 An. 485; R. Statutes, p. 32, sec. 18.

The administration of J. H. Brown's estate involved the administra-

34

tion of the community property, which alone composed the succession of Mrs. Brown. No administration of Rebecca S. Brown's estate was necessary to vest a good title in the property sold. 17 La. 238 and 12 An. 223, succession of McKean.

The interest which the forced heirs had in the property of the succession of their parents was residuary. After the debts are paid the residuum will belong to them. 10 R. 457. And they were not entitled to any other notice of the sale than that given by the advertisements made in accordance with law. Neither was the consent of the creditors needed to make the sale, as the succession was not administered as an insolvent estate, nor was it necessary that a tableau of debts should have been filed prior to obtaining an order for the sale. C. C. 1051, 1058, 1063; 11 An. 633; 2 An. 503; 12 R. 545.

The charge of fraud seems to be predicated chiefly on the private agreement between the administrators and E. and B. Jacobs, and the fact that the price was paid in Confederate money, and that the notes executed for the credit installments were paid on the day the title was passed. The evidence shows that there was a necessity to sell property to pay debts. The tableau of debts, filed shortly after the sale, shows that debts due by the estate and contracted for the education and support of the heirs amounted to upwards of sixty thousand dollars. It appears, further, that the administrators consulted with the relatives of the minors as to whether the land or slaves should be sold, and that it was deemed most to the interest of the children that the land should be sold; that the administrators having learned that the Messrs. Jacobs desired to buy a Red River plantation, wrote to them that the Brown plantation was for sale. In the interview which followed, the administrators informed the Messrs. Jacobs that it would be useless to visit the plantation unless they were willing to give seventy-five dollars per acre for it. After examining the plantation the Messrs. Jacobs agreed to give seventy-five dollars per acre for the property, provided a good title to the same should be given them. We are unable to discover anything in the agreement to indicate a fraudulent or improper intent. The administrators were desirous of securing a bidder for the property at the price stipulated (which is proved to have been the full value of the property at the time the sale was made), and they were not willing to incur the expenses necessary to make a sale unless they had some assurance that the appraisement would be bid by some one. We see nothing improper in this. Every one is presumed to know the law, therefore we can not presume that, even if this private agreement had been known to others, it could have deterred bidders. There is nothing to show that the parties to the contract intended anything of the kind. In fact, the agreement could not have prevented bidders. There remain only the questions

Heirs of Brown et als. v. E. & B. Jocobs et al.

whether the facts that the price was paid in Confederate money, and that the notes given for the credit installments were paid on the day when the deed was passed, vitiate the sale ?

We attach little or no importance to the fact that the notes were paid on the same day the title to the land was passed, for it appears that the credit was intended for the benefit of the purchasers. The credits were for six and twelve months—the notes bore interest only after four months from the dates of the notes, and it is proved that Confederate notes were worth, at the date of the sale, about two for one in gold, or nearly as much as United States treasury notes.

It is contended that there can " be no valid sale without a price, and that price in current money, and that Confederate notes were not a price in current money, or money at all," and that the sale to the Messrs. Jacobs was therefore invalid.

The answer is that it was a judicial sale, made in good faith and in accordance with " existing laws " in 1863, and it was fully executed.

Articles 127, 128 and 149 of the Constitution, construed together, mean that contracts or obligations for Confederate money or notes are reprobated—those which are executed can not be set aside, and those unexecuted can not receive the aid of the courts to enforce them. Paties interested or affected by such contracts are left without any remedy—they can not invoke the aid of the courts to adjust their differences. Lee v. Taylor, 21 An. 514; Smith v. Henderson, 23 An. 649, and Allen v. Cutliff and Husband, 23 An. 614.

In regard to the cotton, the plaintiffs have failed to establish their demand. If a sale of the cotton was made to defendants, as contended by plaintiffs, it was fully executed, and the defendants are protected by article 149. If it was only left with defendants as security for a loan, the evidence preponderates in favor of the defendants' allegation—that it was destroyed or lost through no fault of theirs.

It is therefore ordered, adjudged and decreed that the judgment of the district court be affirmed, with costs of appeal.

---

TALIAFERRO, J., dissenting. Fraud vitiates all contracts, and when made apparent the law relieves innocent parties who have been affected by it. It matters not whether the contracts are executory or executed. Article 149 of the State Constitution in declaring that executed contracts entered into between the twenty-ninth of January, 1861, and the adoption of the Constitution shall have efficacy, announces as a condition of their having force and vitality that they shall have been entered into in good faith. The sale of the property of Brown's estate was made within the period specified in that article, but in my judgment it was made in fraud, and therefore should be held

invalid. The fraud is, to my mind, patent. Conduct such as that of the administrators of this estate should have no countenance from courts of justice. They deliberately enter into a private agreement for a sale of the property to the purchasers, and bind themselves individually and personally to perfect the title to them. They move in the matter from no outside pressure of creditors. No creditor was importuning them for payment. The heaviest debts against the estate were in New Orleans. About two-thirds in amount of all the debts were held by creditors residing there. The administrators were not only not called upon to take order in regard to the payment of the New Orleans creditors, but they could not lawfully do so. Had those creditors been in a position to speak for themselves they would have ignored emphatically the industry used by the administrators to procure Confederate money to pay their debts. The other creditors representing less than half of all the debts, and who were in a situation to urge their claims, were not doing so. They were quiescent, doubtless not wishing to be paid in the only currency with which they could have been paid at the time. But suppose they had been clamorous and demanding a sale of property, there was a sufficient amount of personal property to pay them, and it was the duty of the administrators to have it sold first, and not to have sold the land. But they were personally and individually bound to make the purchasers a good title, and they were the machinery of the law to fulfill their private engagements to sell the property of the estate. They petition for a sale, representing that the estate was in debt, but they present no schedule, no evidence whatever of the fact, and the order of sale was rendered without evidence that there was at the time any necessity for it. A witness who attended the sale says he would have bid more for the property than it sold for, but he understood that his friends, the administrators, were bound to the purchasers that they should have the property for the amount stipulated, and he therefore did not interfere. The administrators set up as a reason for the sale that it was advisable to sell the plantation on the river and purchase a place back in the hill country, to remove the slaves to keep them out of the reach of the Yankees.

In the matter of selling the property of estates, it is the province of administrators to deal with matters of necessity rather than with matters of expediency. The property belongs of right to the heirs of Brown, then minors. If no necessity existed for the sale of it—and certainly none is shown—it could only have been sold on the ground of expediency, as being for the interests of the minors, and for their benefit and advantage; and of this the tutor, with the advice and authorization of the minors' relatives, assembled in family meeting, were to determine, and not the administrator. In no sense can it be

shown that this fraudulent sale of the property of the helpless minors has resulted or could have resulted otherwise than disastrously to them. Had their property not been sold they would have had at the close of the war the same opportunity that all others involved in the same calamity had—that of compromising their debts, getting time to pay them, and to save a large and valuable plantation, now irretrievably lost by the fraudulent acts of administrators grossly abusing the trust confided to them, and acting in violation of law. It would be no excuse to say that their debts were paid by the operation, if such were the fact. But it is not true that the debts have been paid. There are unpaid creditors still, and for large amounts. One of these is a party plaintiff in this case asking redress.

Litigants are not heard in courts of justice to allege their own turpitude, and parties who enter into engagements reprobated by law, and come into the halls of justice to have them enforced, are left as they are found, and are properly denied audience. But the parties seeking redress in this case come into court with clean hands. They are not seeking relief from any reprobated act in which they have participated. They complain of fraudulent acts to their serious injury by other parties. The heirs of Brown complain that they have been divested of their property by the unlawful acts of persons not authorized to represent them. They show that the administrators, as the representatives of the estate, made themselves busy in the matter of getting up the sale of their property when there was no necessity or call for it, and that their conduct throughout has been fraudulent and deleterious to their interests.

The brothers Jacobs bought the property with full knowledge of the illegal conduct of the administrators. This is shown by their becoming parties to the written agreement by which the administrators were bound personally and individually to make them the title for a fixed price, to be paid in Confederate money. This agreement was the main transaction by which these men were to become owners of the property. The machinery of the law, as it was arranged, was to be used merely to give it the very thin veil of a legal proceeding. The agreement was dated December 5, 1862. The administrators presented their petition to the probate court of the parish of Bossier, on the eighth of that month, for a sale of the property precisely on the terms agreed upon. It turned out that the purchasers were the only bidders at the sale. It is in proof that the idle formality of presenting notes was gone through with. The purchasers, eager to get rid of the depreciated currency they were no doubt overstocked with, paid off with it the whole amount of this nominal price. These men are merchants—men of intelligence and shrewdness. Looking to coming events they saw approaching and distinctly visible in the distance the utter worth-

lessness of the prevailing currency. To vest it in valuable planta-
tions was most desirable. Accordingly we find them active and indus-
trious in seeing that the preliminary steps were all properly taken by
which the administrators were to be guided in carrying out their part
of the programme.

This transaction is not, in my judgment, covered by the provisions of
article 149 of the State Constitution. The whole proceeding should be
set aside as null and void, and the property declared to belong to the
estate of Brown.